FRACTIONAL SCHOOL DISTRICT NO. 4 OF GOLDEN TOWN-
SHIP, OCEANA COUNTY *v*. HEDLUND.

1. ADVERSE POSSESSION—EVIDENCE.
    Finding of fact by trial court that title to disputed area upon
    which plaintiff school district is seeking to restrain tres-
    passes by defendant had ripened into title by adverse pos-
    session by the plaintiff prior to and at the time defendant
    became owner of her property immediately adjacent *held,*
    supported by competent evidence.

2. SAME—OPEN AND HOSTILE NATURE OF ACTS.
    Acts of possession must be open and of a hostile character in
    order to claim title by adverse possession.

3. DAMAGES—TREBLE DAMAGES—INJUNCTION.
    Recovery of treble damages for cutting trees on the land of
    another is confined to an action at law and does not extend
    to chancery suit to restrain trespass in which damages are
    also sought (CL 1948, § 692.541).

Appeal from Oceana; Pugsley (Earl C.), J.  Sub-
mitted January 3, 1951.  (Docket No. 38, Calendar
No. 44,957.)  Decided April 3, 1951.

Bill by Fractional School District No. 4 of Golden
Township, Oceana County, Michigan, against Julia
Hedlund to restrain trespasses, to determine title
to 2 strips of land and for damages.  Decree for
plaintiff.  Defendant appeals.  Plaintiff cross-ap-
peals.  Affirmed.

REFERENCES FOR POINTS IN HEADNOTES
[1] 1 Am Jur, Adverse Possession, § 246.
[2] 1 Am Jur, Adverse Possession, §§ 136, 139.
[3] 34 Am Jur, Logs and Timber, § 137.

*Gerald M. Meehan,* for plaintiff.

*Stewart J. Roche* and *R. Burr Cochran,* for defendant.

Sharpe, J.   This is a suit in which plaintiff claims title by adverse possession to strips of land each 50 feet wide on the west and north sides of 'plaintiff's school site.

Plaintiff school district was organized in 1871 and went into possession of a tract of land in the southeast corner of the south one-half of the southeast quarter of section 2, township 15 north, range 18 west, Oceana county, Michigan, and has maintained the present school site.   In 1914, defendant, Julia Hedlund, acquired title to approximately 75 acres of land immediately adjacent to the north and west of the school site.   During the period of 1930–1949 there was excepted from the assessment of taxes on the south one-half of the southeast quarter of section 2 the railroad right-of-way and school site.   The railroad right-of-way represents an area of 3.03 acres.   There is no claim that defendant paid taxes on the 209 feet square of land occupied by the school district.

In the fall of 1949, when plaintiff attempted to place some playground equipment on the west 50 feet, a controversy arose and defendant placed some posts on a line to which she claimed her lands extended.   She also cut down a large maple tree in the west 50 feet to stop permissive use of the disputed area by plaintiff.   The record shows that at times the premises were used for logging purposes and that vehicles have traveled across the west 50 feet in going to and from the wood lot north of the school site now owned by defendant.

The trial court entered a decree granting plaintiff title and possession of the disputed area and award-

ed plaintiff damages in the sum of $200 for the destruction of the maple tree.   In an opinion, it was stated:

"The proofs are undisputed that to the north and back of the school property there is a timber lot, and there are also proofs which are quite conclusive that there are lines of travel extending into the woods which come out on the south, to the west portion of the property claimed by the school district, and there is proofs that vehicles have traveled across the west 50 feet in going to and from this wood lot.   These operations, according to the proofs offered by the defendant, have continued from time to time during the entire time that the defendant has held and owned the property now owned by her around the school property.   *   *   *

"The proofs indicate to the satisfaction of this court that several years before the defendant acquired title to this property, that the boundaries of the school property were enclosed by fences, a fence on the west and a fence on the north.   There is also evidence of a fence on the east between the property of the school district and the land owned by the Weigands.   There is no dispute concerning the east boundary line.   The fence on the west and the north was a rail fence, and it existed there within the memory of some of the witnesses who have testified for the plaintiff in this case.   *   *   *   In other words, it is the opinion of this court that title to the property now claimed by the plaintiff had ripened into a title by adverse possession by the school district prior to and at the time that the defendant became the owner of the property, as now owned by her.

"The fact that subsequent to acquiring it she has gone from time to time, and vehicles under her direction have done the same, across this property in removing wood from the wood lot, does not deprive the school district of its right of ownership of this land.   In other words, permissive use which has been mentioned in this case, was one that was per-

mitted by the school district in permitting the defendant and others acting in her behalf to cross the school property going to and from the wood lot. The proofs show that for the purpose of making entrance into the wood lot, that the rail fence was opened and shut in the manner known to some of us who can remember back to the rail fence days, and it is very clear to this court that the plaintiff is entitled to recover in this case, and the decree to be issued may provide and establish the title in the plaintiff in all the land claimed in the bill of complaint.

"This brings us to the one point which in the mind of the court is the only real issue in the case under the proofs, and that is of the tree that was cut and the damage to the schoolyard. The proofs are undisputed that a large maple tree was cut down by the defendant. It was shortly after that tree had been cut that this suit was started. There seems to be some sentimental value attached to that tree on the part of the school district in that it was located in the northwest corner of the school ground, and under that tree picnics were held from time to time when the pupils and parents of the district had gathered. The only proof as to the value, commercial value of that tree, or to its value from any point of view, was that offered by Mr. Hawley, in which he states that this tree does not have the same value that it might if located on a residence property, neither should its value be reduced to the same value that might be placed upon it for a purely commercial purpose, namely, to cut the same into logs or wood. He placed the value on the tree at $200. I believe the court has a right, and I believe it is the duty of the court to take into consideration the value of this tree as an asset to the school grounds. In fixing its value the court should not be swayed too much by sentimentality; neither should the court reduce its findings of value to a mere commercial basis. I am inclined to feel that the value fixed by Mr. Hawley is a fair one and more than that, as applied to this

particular case, it is the only proof which has been offered. Therefore, as a matter of law, it is binding upon the court."

There is competent evidence to support the finding of fact by the trial court that title to the disputed area had ripened into title by adverse possession by the school district prior to the fall of 1949 when defendant placed some stakes and fence posts where she claimed her land extended to.

Austin Ackley, a witness produced by plaintiff, testified:

"At one time I lived in the Fractional School District No. 4. I come there in 1904. I bought a farm at that time and lived on this farm for 38 years. I moved on the farm and bought it in 1904 and moved off it in 1942. During all those years from 1904 to 1942, I lived on the farm. That was located about a quarter of a mile from the Hovey school. I was a member of the school board more than 20 years ago. I guess it was that long, when I was first on the school board.

"*Q.* When you first moved in the neighborhood in 1904, did you have occasion to observe this school site?

"*A.* Yes.

"*Q.* In particular, the schoolyard as occupied by the school district?

"*A.* Yes.

"*Q.* In reference to where the cleared area, that property now being used by the school district, where were the lines then as compared to where they are now?

"*A.* Just practically the same. *    *    *

"I have been out there and had occasion to see when there were fence posts put in there by Mr. Hedlund. They never plowed over as far as the fence posts at any time. There wasn't any of that north and west part of the school ground ever

plowed. Concerning the south end, nobody ever cultivated to where she had those posts. In the last 2 or 3 years they got over on the school district a few feet.   *   *   *

"There has been testimony that there were some outhouses located on this property to the north and to the west and east of the schoolhouse. I recall those outhouses. They were taken down after toilet facilities were placed in the schoolhouse.

"In reference to the west line, I know about where those posts are Mrs. Hedlund put in.

"*Q.* Would you say the outhouse on the west was west or east of the line where she put the posts?

"*A.* West. In other words, if that line is 50 feet from the present school site line, 50 feet east of where she put the posts, I would say the outhouse was within that 50-foot area. Those outhouses were there ever since I was there until they put in the cesspool, from 1904 until approximately 5 years ago.
*   *   *

"*Q.* Do you remember any fences around the schoolyard?

"*A.* There was an old rail fence when I first come there on the west. Weigands always kept that fenced.

"*Q.* There was a fence on the west side?

"*A.* Yes, there was a rail fence.

"*Q.* Where was that rail fence?

"*A.* Right along the edge of the school ground there.

"*Q.* Is it what you have referred to as the boundary line?

"*A.* Yes, between the woods.

"*Q.* Is that where the rail fence was then?

"*A.* Yes.

"*Q.* How long had that fence been there?

"*A.* I don't remember just how long. I think it was finally took out for wood or some used for wood, hauled out of there, but Graffs used to pasture that

woods some when they lived there; cattle run in there.

"*Q.* That rail fence on the west and north is what kept the cattle and stock from coming into the school-yard, is that right?

"*A.* Yes, sir.

"*Q.* That rail fence was there when you got your property in 1904?

"*A.* Yes."

Carolyn Schulien, a witness produced by defendant, testified:

"I was born there in the house I am living now. I am 58 years old. I started to school in this Fractional School District No. 4. I was 6 years old when I started to school. 52 years ago I started to school in this particular school in about 1898. Something like that.    *    *    *

"*Q.* You say when you were going to school there was a rail fence across the north line and across the west line?

"*A.* Yes, sir.

"*Q.* In reference to the cleared area as we think of the schoolyard site today, would you say the rail fence was about where the clearing is today?

"*A.* I think so.

"*Q.* That is on the west, following the line where it has been brushed out. It would also be true the rail fence would be across the north line where it is today?

"*A.* Yes.

"*Q.* Do you remember it as a child?

"*A.* Yes.

"*Q.* The lines today are about where they were and where the fence was?

"*A.* Yes.

"That was 50 or 52 years ago. That is about right. I don't remember when the fence was taken down. It wasn't when I left there. I don't know how long the fence had been there. It wasn't a new fence then,

just one of those old-fashioned rail fences. When they wanted to drive through it, they turned the rails half way and drove through and put the rails back up again in the spring."

In order to claim title by adverse possession the acts of possession must be open and of a hostile character.

In *Murray* v. *Hudson,* 65 Mich 670, we approved the following:

"To constitute possession it is not necessary that the land should be enclosed with a fence, or that the same should be cultivated or resided upon, or that buildings should be erected thereon. It is sufficient if the acts of ownership are of such a character as to openly and publicly indicate an assumed control or use such as are consistent with the character of the premises in question."

This is a chancery case in which the trial judge saw and heard the witnesses and was able to measure their credibility. On a review of the record, we are not disposed to disagree with his conclusion. The decree granting plaintiff title by adverse possession is affirmed.

Plaintiff filed a cross appeal from the decree and urges that the trial court was in error in failing to award treble damages for the value of the tree destroyed by defendant under CL 1948, § 692.451 (Stat Ann § 27.2161).

We are not in accord with plaintiff's theory of damages. In *Diefenbaker* v. *Post,* 276 Mich 514, we had occasion to construe this statute in a chancery suit. We there said:

"The instant case does not come within the terms of the statute providing for treble damages. CL 1929, § 15124. The statute authorizes recovery of treble damages in actions at law only."

The decree of the circuit court is affirmed, with costs to plaintiff.

Reid, C. J., and Boyles, North, Dethmers, Butzel, Carr, and Bushnell, JJ., concurred.